IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

UNITED STATES OF AMERICA                                                                  PLAINTIFF

v.                                    Case No. 4:19-cr-672-KGB

JUSTIN DEQUIZE PRESTON                                                                   DEFENDANT

**ORDER**

Before the Court is defendant Justin Preston's motion to reconsider the Court's prior denial of his motions to suppress (Dkt. No. 110). The government filed a written response (Dkt. No. 120). The Court held a hearing on March 27, 2023, and the parties filed post-hearing briefs (Dkt. Nos. 132; 133). Mr. Preston also filed a motion to supplement the record, to which the government does not object (Dkt. No. 131). The Court grants the motion to supplement (Dkt. No. 131). For the following reasons, the Court denies Mr. Preston's motion to reconsider (Dkt. No. 110).

I.  **Background**

A.  **Procedural History**

This case was initially assigned to the docket of the Honorable D.P. Marshall Jr. While the case was on Judge Marshall's docket, Mr. Preston filed motions to suppress evidence based on the traffic stop, the search of his vehicle, and questioning by law enforcement officers (Dkt. Nos. 76-78). Mr. Preston also moved for a separate trial on count four of the Indictment, which charges Mr. Preston with being a felon in possession of a firearm (Dkt. No. 79). Judge Marshall entered an Order setting a hearing on the vehicle search but denying Mr. Preston's other motions (Dkt. No. 93). After the government filed supplemental briefing on the vehicle search (Dkt. No. 95), to which Mr. Preston did not respond, Judge Marshall canceled the suppression hearing and denied Mr. Preston's remaining motion to suppress (Dkt. No. 100).

Mr. Preston filed a motion to reconsider the denial of his motions (Dkt. No. 110). Judge Marshall granted Mr. Preston's embedded request for a hearing and scheduled a hearing on March 27, 2023 (Dkt. No. 116). Judge Marshall later transferred the case to the docket of the undersigned based on availability to conduct the hearing (Dkt. No. 121).

### B.     Factual Background

This Court, when considering the pending motion to reconsider and underlying motions to suppress, reviewed the video, testimony, and other evidence provided at the suppression hearing. The Court also considered the supplements to the record requested by Mr. Preston. Based on the Court's review of the video, testimony, and other evidence, the Court recites this factual background.

At approximately 9:40 p.m. on November 23, 2019, Detective Jeremy Crosby and Officer Christopher Sweeney with the Pine Bluff Police Department ("PBPD") were driving south on Camden Road in Pine Bluff, Arkansas. They saw a white Dodge Charger move from the left lane into the right lane and almost immediately make a right-hand turn. Detective Crosby activated his blue lights, and the Charger fled. Arkansas State Police ("ASP") Trooper Shane Caviness, who was in a separate vehicle following close behind, captured the sequence on his dashcam.

The Charger led the PBPD and Trooper Caviness on a chase through a residential neighborhood at speeds exceeding 80 miles an hour. The chase ended when the Charger wrecked on private property, and Trooper Caviness's car crashed into it. As law enforcement officers converged on the vehicle, Trooper Caviness saw the driver, Justin Preston, slump over in his seat and appear to grab or stash something. Trooper Caviness told Mr. Preston to show his hands, and Mr. Preston exited the vehicle backward, leading with his backside. Mr. Preston initially only raised his left hand, though he quickly put both hands in the air. Mr. Preston left the driver's door

open after exiting the vehicle. Trooper Caviness ordered Mr. Preston to get on the ground, and Mr. Preston eventually laid down near the rear of the Charger on the driver's side.

Multiple law enforcement officers surrounded the Charger including Officer Sweeney, who can be seen in the dashcam video wearing a Dallas Cowboys hat and holding a flashlight. The officers removed three passengers from the Charger while Trooper Caviness was securing Mr. Preston. Officer Sweeney looked inside the vehicle and saw an extended ammunition magazine, which was attached to a pistol, sticking out from under the driver's seat. When Officer Sweeney found the gun, Mr. Preston was laying on the ground on the driver's side at the rear of the Charger, but one of the passengers was standing next to Officer Sweeney on the driver's side of the car. Officer Sweeney testified that he first saw the magazine through the open door when he was still outside the vehicle; he did not have to stick his head inside the car to see it. Officer Sweeney took a picture of what he saw under the seat (Gov. Ex. 2). Officer Sweeney also took pictures of a purse sitting on the center console in the front of the car and a fanny pack on the driver's seat (Gov. Ex. 7-9). The fanny pack is unzipped, and a green, leafy substance can be seen inside it (Gov. Ex. 8). Officer Sweeney testified that he saw the green, leafy substance before sticking his head into the car.

Trooper Nick Burleson of the ASP was responsible for having the Charger towed from the private property and completing all related documents. Trooper Burleson did not conduct an inventory search on the Charger. He testified that he typically would have completed an inventory search. However, there were multiple agencies involved in responding to the scene, and his understanding was that the inventory search would be completed by another agency.

An officer with the PBPD transported Mr. Preston to ASP headquarters in Pine Bluff. At approximately 11:30 p.m., about two hours after Mr. Preston's arrest, Special Agent Stephen Briggs of the ASP and Special Agent Tyler Cowart of the Bureau of Alcohol, Tobacco, Firearms,

3

and Explosives interviewed Mr. Preston. Special Agent Briggs and Special Agent Cowart were not involved in the chase or search of the Charger. Special Agent Briggs and Special Agent Cowart only responded to the scene after Officer Sweeney discovered the gun and drugs, and both testified that they did not interact with Mr. Preston at the scene.

Special Agent Briggs and Special Agent Cowart did not ask Mr. Preston any questions before beginning their recorded interview.[1] At the outset of the interview, Special Agent Briggs read Mr. Preston his *Miranda* rights. Mr. Preston waived his rights and answered their questions.

## II. Argument

Mr. Preston argues that the initial stop and the subsequent vehicle search violated his Fourth Amendment rights and moves to suppress the evidence against him. Mr. Preston also argues that any statements he made after receiving his *Miranda* warnings were not knowingly and voluntarily given, meaning they should be suppressed. He also renews his request for a separate trial on count four of the Indictment. The Court addresses each argument in turn.

### A. Initial Stop

Mr. Preston argues that the PBPD did not have reasonable suspicion or probable cause to pull him over, meaning all subsequently discovered evidence should be suppressed (Dkt. No. 81). However, Detective Crosby and Officer Sweeney testified that they saw Mr. Preston's car make a right-hand turn from the left, inside lane. Arkansas law provides that "[b]oth the approach for a right turn and a right turn shall be made as close as practical to the right-hand curb or edge of the roadway." Ark. Code Ann. § 27-51-401(1).[2] Detective Crosby and Officer Sweeney's testimony

---

[1] Mr. Preston testified that Special Agent Briggs asked him multiple questions before his recorded interview about gang activity and murders in the Pine Bluff area. As will be discussed *infra*, the Court finds that Mr. Preston's testimony was not credible based on the Court's observations of Mr. Preston's demeanor while testifying on direct and cross examination.

[2] Mr. Preston focuses his argument on a different traffic law that was cited in the police report as the justification for the stop (Dkt. No. 81, at 2). However, an arresting officer's

is consistent with—or, at the very least, not contradicted by—the footage captured from Trooper Caviness's dashcam (Gov. Ex. 1, at 00:30-00.40). The Court credits Detective Crosby and Officer Sweeney's testimony and finds that the PBPD had an objectively reasonable basis for believing that Mr. Preston committed a traffic violation. *United States v. Stewart*, 32 F.4th 691, 694 (8th Cir. 2022). The attempted traffic stop did not violate Mr. Preston's Fourth Amendment rights. *United States v. Coleman*, 700 F.3d 329, 334 (8th Cir. 2012). The Court denies Mr. Preston's motion to reconsider on this issue.

Mr. Preston's motion to suppress also fails because he was not seized when the officers attempted to pull him over. For the purposes of the Fourth Amendment, a "seizure occurs 'when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *United States v. Flores-Lagonas*, 993 F.3d 550, 559 (8th Cir. 2021) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). There is no seizure "unless the individual actually submits to the 'show of authority.'" *Id.* at 559-60 (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). Mr. Preston fled from the attempted stop. He was not seized until after he led officers on a high-speed chase through a residential neighborhood and wrecked his vehicle on private property. At that point, there was probable cause to arrest Mr. Preston for a variety of crimes, including felony fleeing. Considering the totality of the circumstances, law enforcement had probable cause to believe Mr. Preston had committed a crime when they ultimately seized him after the car chase. *Id.* at 561.

---

"'subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.'" *United States v. Guevara*, 731 F.3d 824, 828 (8th Cir. 2013) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)).

### B. Subsequent Search

Mr. Preston next challenges Officer Sweeney's warrantless search of the Charger, which resulted in the discovery of the gun and drugs. The "cardinal principle" in Fourth Amendment search and seizure jurisprudence is that "'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions.'" *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *see United States v. Marshall*, 986 F.2d 1171, 1173 (8th Cir. 1993) (quoting same). "When the government seeks to introduce evidence that was seized during a warrantless search, it bears the burden of showing the need for an exemption from the warrant requirement and that its conduct fell within the bounds of the exception." *Marshall*, 986 F.2d at 1173 (citing *Mincey*, 437 U.S. at 391). Here, the government argues that three exemptions to the warrant requirement apply to Officer Sweeney's search: (1) the plain view doctrine; (2) search incident to arrest; and (3) inevitable discovery.

#### 1. Plain View

The plain view exemption to the warrant requirement permits law enforcement officers to seize evidence without a warrant if they "'are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object . . . .'" *United States v. Class*, 883 F.3d 734, 737 (8th Cir. 2018) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)). Here, the key question is when Officer Sweeney first saw the gun or drugs. If it was before he physically entered the car, and if the incriminating character of the contraband was immediately apparent, then the plain view exception applies. *United States v. Hatten*, 68 F.3d 257, 260-61 (8th Cir. 1995); *see also United States v. Smith*, 990 F.3d 607, 612 (8th Cir. 2021). If it was only after he entered the car, the exception does

6

not apply.  *United States v. Jones*, 565 U.S. 400, 404 (2012); *United States v. Ngumezi*, 980 F.3d 1285, 1288-91 (9th Cir. 2020); *United States v. Ryles*, 988 F.2d 13, 15 (5th Cir. 1993).

The dashcam footage shows Officer Sweeney discovering the gun and drugs in the Charger, but the exact moment he first saw the items is not clear.  Officer Sweeney testified that he saw both the gun and the drugs through the open driver's door before he went into the vehicle.  Officer Sweeney took a picture of the gun, which shows that the extended magazine was jutting out from under the seat (Gov. Ex. 10).  He also took a picture of an open fanny pack on the driver's seat containing a green leafy substance (Gov. Ex. 8).  Officer Sweeney testified that he did not move the gun or the fanny pack before taking the pictures.  He also testified that, based on his training and experience as a narcotics agent, he knew that the green substance was marijuana.  *United States v. Garner*, 907 F.2d 60, 62 (8th Cir. 1990).

Mr. Preston makes three arguments challenging Officer Sweeney's credibility.  First, Mr. Preston argues that Officer Sweeney's testimony is unsupported by the dashcam footage (Dkt. No. 132, at 3-5).  Nothing in the video, however, contradicts Officer Sweeney's recollection of the events.  Second, Mr. Preston challenges Officer Sweeney's testimony that he did not move items inside the car before taking photographs, pointing to differences between two photographs introduced into evidence (Dkt. No. 132, at 5).  A purse appears on the center console in the two photographs (Gov. Exs. 7-8).  Mr. Preston did not explore any purported differences in these two photographs on cross-examination with Officer Sweeney.  More importantly, the fanny pack containing the drugs appears to be unmoved in the two photographs.  Third, Mr. Preston points to a photograph looking down at the driver's seat where the gun is not visible and argues that this demonstrates that Officer Sweeney could not have seen the gun before entering the vehicle (Doc. No. 132, at 5; Gov. Ex. 8).  The argument would have some persuasive force if an overhead view was the only one available to Officer Sweeney and if this photograph were the only record evidence

7

on this matter.  Neither is the case.  The driver's door was wide open, meaning someone standing next to the car could look under the seat without entering the car.  Indeed, the dashcam video shows Officer Sweeney ducking down next to the open door.

The Court credits Officer Sweeney's testimony and finds that the government has met its burden of showing that the plain view exception applies.  *United States v. White*, 41 F.4th 1036, 1038–39 (8th Cir. 2022).  For these reasons, the Court denies Mr. Preston's motion to reconsider denial of his motion to suppress on the vehicle search.

### 2.   Search Incident to Arrest

Even absent plain view, the Court would deny Mr. Preston's motion to suppress because Officer Sweeney's discovery of the gun and drugs was a valid search incident to an arrest.  Mr. Preston argues that this doctrine does not apply because he was restrained when Officer Sweeney found the contraband.  The dashcam shows, however, that at least one passenger was standing within reach of the open driver side door when Officer Sweeney found the gun, and it does not appear that he was handcuffed.  *United States v. Salamasina*, 615 F.3d 925, 929–30 (8th Cir. 2010).  The search happened at night, minutes after a high-speed chase through a residential neighborhood.  There were multiple suspects in and around the vehicle, and the scene was chaotic.  The Court concludes that an "objective officer considering these facts . . . would be warranted in conducting a search of the vehicle incident to [Mr. Preston's] arrest under *Gant*'s officer-safety consideration." *Id.* at 930.

### 3.   Inevitable Discovery

The government's final argument is that the gun and drugs should not be suppressed because they would have been inevitably discovered in an inventory search after the Charger was towed from the scene.  This argument is complicated by the fact that Trooper Burleson admittedly

8

did not complete an inventory search. The Court declines to reach this argument, in the light of its findings on plain view and search incident to arrest.

### C. Questioning

Mr. Preston moves for reconsideration on the denial of his motion to suppress his own incriminatory statements. The government does not intend to introduce any statements made by Mr. Preston before he received *Miranda* warnings (Dkt. No. 91, at 12). The Court must therefore determine whether to suppress statements Mr. Preston made to Special Agent Briggs and Special Agent Cowart in an interview at ASP headquarters approximately two hours after Mr. Preston was arrested.

Mr. Preston claims that Special Agent Briggs and Special Agent Cowart employed a "question-first" interrogation technique "where officers would intentionally refrain from giving the *Miranda* warnings to suspects in custody," and, once they elicited an inadmissible confession, "they would then give the warnings" at which time "[t]he suspect would generally confess again." *United States v. Ollie*, 442 F.3d 1135, 1141 (8th Cir. 2006). Special Agent Briggs and Special Agent Cowart denied using this technique. The Court finds that their testimony was credible, consistent, honest, and forthright. Mr. Preston's self-serving testimony to the contrary was not credible. Mr. Preston testified that Special Agent Briggs spoke with him for approximately 20 minutes before starting the recorded interview, but Mr. Preston refused to elaborate on what was discussed other than vaguely claiming that he gave false information about gang activity in Pine Bluff. The Court finds that the government met its burden of showing by a preponderance of the evidence that Special Agent Briggs and Special Agent Cowart did not use a "question-first" or "two-step" interrogation to attempt deliberately to circumvent *Miranda*. *United States v. Torres-Lona*, 491 F.3d 750, 758 (8th Cir. 2007); *see also United States v. Rooney*, 63 F.4th 1160 (8th Cir. 2023) ("Also significant to the analysis is the two hours that elapsed between Agent Roberts' initial

interrogation of Rooney and his second Mirandized interrogation. These two interrogations were not close enough in time to constitute a single, indistinct event formally punctuated by *Miranda* warnings in the middle." (quotations omitted)).

In the light of this Court's finding that there was no calculated effort to circumvent *Miranda*, the relevant question is whether Mr. Preston's post-*Miranda* warning statements were knowingly and voluntarily made. *Torres-Lona*, 491 F.3d at 757-58. When Mr. Preston was interviewed, he was a 30-year-old convicted felon who spoke English, signed a *Miranda* waiver form, and was interviewed at ASP headquarters approximately two hours after he was arrested. The totality of the circumstances demonstrates that Mr. Preston knowingly and voluntarily waived his *Miranda* rights. His motion to reconsider the denial of his motion to suppress his statements is denied. *Rooney*, 63 F.4th at *5-6.

### D.  Motion for a Separate Trial on Count Four

The parties have not made any additional arguments on Mr. Preston's motion for a separate trial on the felon in possession count in the Indictment. The Court reviewed the parties' initial filings on this issue. The Court denies Mr. Preston's motion to reconsider on this issue for the reasons stated in Judge Marshall's prior Order (Dkt. No. 93, at 2-3).

### III.  Conclusion

The Court finds that, based on the evidence presented during the suppression hearing, law enforcement officers did not violate Mr. Preston's constitutional rights. The Court denies Mr. Preston's motion to reconsider consistent with this Order (Dkt. No. 110). The Court grants the motion to supplement the record (Dkt. No. 131).

It is so ordered this 12th day of April, 2023.

_____
Kristine G. Baker
United States District Judge